Filed 2/27/23  Chimal v. Vong CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| LYNETTE CHIMAL et al., | D080517 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. RIC1902960) |
| JENNIFER VONG, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Riverside County, John W. Vineyard, Judge.  Affirmed in part and reversed in part with directions.

Law Offices of Wole Akinyemi and Wole Akinyemi for Plaintiffs and Appellants.

Neil, Dymott, Frank, McCabe & Hudson, Clark R. Hudson and David P. Burke for Defendant and Respondent.


INTRODUCTION

Lynette Chimal's baby died soon after delivery by cesarean section following a protracted labor.  She and her partner, Jasen Watson (together,

Plaintiffs), sued Dr. Jennifer Vong, the delivery physician, and Parkview Community Hospital Medical Center (Parkview), alleging professional negligence, wrongful death, and intentional infliction of emotional distress (IIED). After Parkview settled with Plaintiffs, Dr. Vong moved for summary judgment. The trial court granted summary judgment, finding that Plaintiffs failed to show triable issues of fact as to the elements of breach of duty and causation on the first and second causes of action for negligence and wrongful death,[1] and extreme and outrageous conduct on the third cause of action for IIED.

On our de novo review, we conclude Plaintiffs met their burden of producing conflicting evidence on whether Dr. Vong's conduct fell below the standard of care and caused Plaintiffs' injuries. Accordingly, triable issues of material fact on the negligence and wrongful death causes of action preclude summary judgment and we reverse as to the first and second causes of action. We find no error as to the trial court's conclusion that Plaintiffs failed to produce evidence showing extreme and outrageous conduct to support a cause of action for IIED and so we affirm summary adjudication of the third cause of action.

---

[1]    In setting forth its findings on breach of duty and causation, the trial court did not delineate between the negligence and wrongful death causes of action, but it entered judgment in favor of Dr. Vong and dismissed the entire action with prejudice. We presume the court disposed of both causes of action.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Chimal's Labor and Delivery at Parkview*[2]

On May 17, 2018, Chimal was 40 weeks pregnant. It was her first pregnancy, and she was 18 years old. At 11:30 p.m. that day, Chimal's water broke and her treating obstetrician, Dr. Herman Carstens, admitted her at Parkview at 2:52 a.m. on May 18.[3] She was 50 percent effaced and -3 station upon admission.[4] Her pregnancy was noted to be complicated by class 2 obesity and elevated thyroxine levels. Chimal was given a cervical ripening medication and Pitocin at 2:35 a.m. to help move her labor along. At 8:43 a.m. and 11:37 a.m. she was given another cervical ripening medication, Cytotec, but Chimal's labor did not progress to a vaginal delivery.

---

[2]   Because this is an appeal from a grant of summary judgment in favor of Dr. Vong, we examine the evidence de novo and "our account of the facts is presented in the light most favorable to the nonmoving party below, in this case [Plaintiffs], and assumes that, for purposes of our analysis, *[Plaintiffs'] version of all disputed facts is the correct one.*" (*Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 999 (*Birschtein*), italics added; accord *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470.) Here also, both parties relied on medical records, including the labor and delivery flowsheet (LD flowsheet), which listed all of the data collected on the fetus and mother as well as notes from the attending nurses, for the relevant undisputed medical data. As we later explain, it is their experts' interpretation of the medical data that is in conflict.

[3]   All further dates refer to 2018 if no year is specified.

[4]   The percent "effaced" indicates how much the cervix has thinned out just before or during labor. (See Stedman's Medical Dict. (28th ed. 2006) p. 613, col. 2.) A baby's "station" is "[t]he degree of descent of the presenting part of the fetus through the maternal pelvis[.]" (*Id.* at p. 1830, col. 1.)

3

On the evening of May 18, Dr. Vong was the on-call physician at Parkview covering for Dr. Carstens' patients, including Chimal. Although she managed Chimal's care remotely that evening and the next day while she was caring for patients at another hospital, Dr. Vong had access to Chimal's vital signs and the fetal heart rate tracings on her phone, and access to the nursing staff at Parkview who were reporting Chimal's progress.

At 11:31 p.m. on May 18, a nurse telephoned Dr. Vong to report that Chimal's membranes had been ruptured for 24 hours; they had placed a monitor (a scalp electrode) on the fetus; and Chimal's last temperature was 99.5 degrees Fahrenheit. Dr. Vong ordered the nurse to administer antibiotics to Chimal and to notify her if Chimal's temperature reached 100.4 degrees.

At 4:00 a.m. on May 19, a nurse noted Chimal had normal uterine contractions, but the fetal heart rate tracing on the fetal strip[5] (the strip) showed the fetus was experiencing moderate heart rate variability (meaning that it was fluctuating by 6 to 25 beats per minute) and early, variable

---

[5] Plaintiffs provided a copy of the "Stored Fetal Strip" from Chimal's labor at Parkview. During her deposition, Dr. Vong interpreted this strip, explaining that it showed both Chimal's contractions and the fetus's heart rate pattern. This strip allowed both Dr. Vong and the Parkview nursing staff to monitor the fetus and watch for accelerations, decelerations, tachycardia, and other changes in the fetus's status.

decelerations.[6]  In light of this fetal heart rate pattern, the nurse categorized the tracing as a Category II strip.[7]

At 5:27 a.m., an anesthesiologist was at Chimal's bedside; she was given an antibiotic, ampicillin, intravenously at 5:30 a.m. and an epidural at 5:40 a.m.

At 7:10 a.m. on May 19, Nida Llorico came on as the nurse attending to Chimal.  At 7:15 a.m., Llorico examined Chimal and noted in the LD flowsheet that her amniotic fluid was clear.

At 10:00 a.m., the strip showed a fetal heart rate of 160 beats per minute, "[m]inimal" variability, accelerations "absent," and the presence of a late deceleration.[8]  Llorico entered the tracing as a Category II strip.  The

---

[6]    Neither party provides us with any definition of "decelerations," but the Stedman's Medical Dictionary definitions for early, variable, and late decelerations clarify that a deceleration is a temporary slowing of the fetal heart rate in relation to a uterine contraction.  (See Stedman's Medical Dict., *supra*, at p. 496, col. 2 [defining an "early d[eceleration]" as "slowing of the fetal heart rate early in the uterine contraction phase"; defining a "variable d[eceleration]" as a "transient fetal bradycardia . . . which may occur at any time in relation to a uterine contraction"; defining a "late d[eceleration]" as "any transient fetal bradycardia, with onset of d[eceleration] at the peak of the uterine contraction and nadir as contraction finishes"].)

[7]    Although the parties never explain the criteria used by medical staff in ranking a fetal strip as a Category I, II, or III, we infer from the record that a tracing moves from Category I to Category II if the fetus exhibits a change in its baseline heartrate (such as tachycardia), changes in variability, or accelerations and decelerations.  We further infer that a Category III strip signifies the fetus is experiencing the most concerning heartrate patterns, as Dr. Vong testified that a Category III strip warranted intervention by cesarean section.

[8]    The LD flowsheet contains a prefilled category of "Decelerations" (as well as "Accelerations") under "Fetal Assessment," next to which there are

5

late deceleration concerned Llorico so she performed "Fetal Interventions" to include turning Chimal "side to side" and giving her "some fluids through the IV."

At 10:30 a.m., Llorico entered in the LD flowsheet that the fetus was experiencing tachycardia, with a fetal heart rate of 175 to 180 beats per minute. Although the late deceleration had "resolved" at this time, she entered the tracing as a Category II strip due to the tachycardia. She did a sterile vaginal exam of Chimal and, because she was concerned by the change in the fetal heart rate, Llorico called Dr. Vong at 10:37 a.m. Llorico reported the sterile vaginal exam results, the fetal heart rate status, and Chimal's contraction pattern to Dr. Vong. Dr. Vong ordered Llorico to repeat the sterile vaginal exam, re-check maternal temperature, and to call her with the results.

At 10:50 a.m., Llorico performed another sterile vaginal exam, noted there was a "small amount of clear fluid," and recorded Chimal's temperature had elevated to 102.5 degrees.

At 11:00 a.m., the strip showed the fetus still tachycardic with a fetal heart rate of 170 beats per minute, moderate variability, and both accelerations and late decelerations present. The tracing remained a Category II strip.

At 11:05 a.m., Llorico reported to Dr. Vong that Chimal's cervix had not further dilated, and she had a fever of 102.5 degrees. Llorico also reported to Dr. Vong that the strip showed fetal tachycardia of 170 to 180 beats per

---

empty fields for the medical staff to enter their observations or actions. Although the 10:00 a.m. entry for May 19 merely states "Late" next to "Decelerations," both Llorico and Dr. Vong testified in their depositions there was a single late deceleration at 10:00 a.m.

minute, with late decelerations. Dr. Vong gave orders for intravenous (IV) fluids, Tylenol, and the antibiotic gentamicin.

At 11:30 a.m., Llorico performed additional fetal interventions, including repositioning Chimal and administering IV fluids and oxygen to her. The fetus remained tachycardic with accelerations and late decelerations. Dr. Vong called Llorico with instructions to discontinue Pitocin; Llorico made her aware that Pitocin had been off since 11:05 a.m.

At 12:00 p.m., the fetus was still tachycardic with a heart rate of 180 beats per minute, moderate variability, absent accelerations, and late decelerations. The tracing continued as a Category II strip. At this hour, Dr. Vong called and ordered Llorico to prepare Chimal for delivery by cesarean section.

At 12:15 p.m. on May 19, according to the LD flowsheet, Dr. Vong was at Chimal's bedside.

At 12:37 p.m., Chimal was taken to the operating room.

Dr. Vong explained her decision to proceed to a cesarean section at 12:00 p.m. on May 19, in her operative report: Chimal "was noted to develop a maternal fever [of] 102 and maternal tachycardia, consistent with chorioamnionitis[9]. . . . Fetal heart tones were noted for fetal tachycardia which developed after maternal fever with baseline changing between 165-175 [beats per minute]. . . . There was moderate variability throughout the

_____

9      Chorioamnionitis is an "[i]nfection involving the chorion, amnion [the amniotic sac], and amniotic fluid; usually the placental villi and decidua are also involved." (Stedman's Medical Dict., *supra*, at p. 371, col. 1; see also Merriam-Webster's Medical Dict. Online (2023) <https://unabridged.merriam-webster.com/medical/chorioamnionitis> [as of Feb. 27, 2023], archived at <https://perma.cc/3YKH-Y65U> [defining chorioamnionitis as "inflammation of the fetal membranes"].)

7

fetal tachycardia but repetitive late decelerations developed and persisted despite resuscitative efforts. Her sterile vaginal exam was noted to be 5 cm, 90 percent effaced and -1 station. Decision was made to proceed with a . . . cesarean section delivery due to prolonged rupture of membranes, failure to progress, chorioamnionitis and fetal tachycardia with late decelerations."

At 12:56 p.m., surgery began. Upon entering the amniotic cavity, Dr. Vong noted a "[l]arge amount of thick yellow meconium stained fluid with particulate[s]" and "a large amount of meconium."[10]

At 1:03 p.m., Dr. Vong delivered the baby and passed the baby to the waiting neonatal intensive care unit (NICU) nurse for suctioning of the mouth and nostrils and for neonatal assessment. Dr. Vong clamped the cord and cut a segment for cord gas readings. The placenta, which was given to pathology, was intact, but the membranes contained meconium staining. Arterial cord gas readings from the cord segment were recorded as "pH 7.07, PCO2 68, PO2 11.0, HCO3 19.7, BE-11.8, SaO2 15.4." Chimal returned to the recovery room in stable condition. The baby was taken to the NICU for respiratory distress.

At approximately 7:00 p.m. on May 19, the baby was transferred to Children's Hospital of Orange County (CHOC) where she passed away on May 20 at 6:27 a.m. After briefly being discharged to visit her daughter's body, Chimal was readmitted to Parkview that day for postoperative and postpartum care and treatment of her infection and fever. She remained in the hospital on antibiotics until May 24.

---

[10] Meconium is "[t]he first intestinal discharges of the newborn infant, greenish in color and consisting of epithelial cells, mucus, and bile." (Stedman's Medical Dict., *supra,* at p. 1167, col. 2.)

## II.

### *Laboratory, Pathology and Autopsy Reports*

Parkview conducted pathology studies of the placenta and umbilical cord specimens on May 19. A pathology report dated May 22 listed the following diagnosis from the tissue samples: "moderate to marked acute funisitis"; "moderate, focally approaching marked acute chorioamnionitis with necrosis"; "placental infarct approximately 2 centimeters in greatest dimension"; "acute deciduitis"; and "meconium-laden macrophages, amnion and chorion (2)(CO)." (Capitalization omitted.) A laboratory report dated May 19 at 2:24 p.m. identified the "positive growth of: Escherichia coli" (E. coli) in the baby's blood culture sample.[11] (Capitalization omitted.)

CHOC performed an autopsy of the baby on May 20. In the autopsy report, the pathologist noted "[t]he girl baby was delivered by [cesarean section] with the history of prolong ROM [rupture of membranes] and fever of the mother. No other prenatal complication was noticed." In microscopic analysis of "sections of bilateral lung from each lobe," the pathologist noted in the report: "Many colonies of bacteria are identified intermixed with acute inflammatory exudates. The findings are consistent [with] amniotic aspiration related bacterial pneumonia." The report concluded, "The cause of death is acute pneumonia." The final diagnosis was "bilateral acute pneumonia" with "colonies of bacteria identified" and "evidence of inhaled amniotic fluid." (Capitalization and boldface omitted.) Otherwise, it noted that "no other significant histopathological changes [were] identified." (Capitalization and boldface omitted.)

---

11      The copy of the laboratory results for Chimal in our record contains an entry under "blood culture" that is not readable. (Capitalization omitted.)

*Chimal's Complaint*

In May 2019, Plaintiffs filed a verified complaint against Parkview, asserting three causes of action for professional negligence, wrongful death, and IIED. They subsequently filed a Doe amendment to name Dr. Vong as a defendant as to all three causes of action.

Plaintiffs alleged the "medical records and fetal heart rate tracings" demonstrated "significant delay" in the delivery of the baby, and that "[t]he baby should have been delivered minimally over 2.5 hours earlier after admission." They alleged there was "no[t] adequate monitoring of the fetal heart rate tracings which should have given important clues to the delivery doctor and nursing staff as to when the baby should have been delivered." Plaintiffs asserted "[t]he fetal heart rate tracings showed that the baby[12] was ready to be delivered at 9:00 a.m. on May 19, 2018," and that by 1:00 p.m. the same day, "the heart rate of the baby had dropped significantly and still nothing was done." According to Plaintiffs, by the time the cesarean section was performed, "the baby was already in septic condition, and it was too late."

In support of her IIED cause of action,[13] Chimal alleged she was aware that Dr. Vong and the nurses' conduct "was causing injury to [the baby]

---

[12] It is general knowledge that the term "fetus" is used prior to delivery and "neonate" or "baby" after delivery. We will use these terms, except when directly quoting the parties' or their experts.

[13] Plaintiffs' complaint appears to allege an IIED cause of action only on behalf of Chimal, thus our discussion and analysis of that cause of action will be so limited. But we note that any such allegation by Watson would fail because when he was asked during his deposition, "do you believe that

because she notice[d] that the baby was not breathing when the baby was removed from her womb." As a result, she "sustained serious emotional distress and damages, severe mental anguish, emotional and physical distress, [and] humiliation by having to watch her baby die of unnecessary death."

## IV.

### *Summary Judgment Proceedings*

A.    *Dr. Vong's Motion and Supporting Evidence*

Dr. Vong moved for summary judgment, or alternatively summary adjudication, as to all three causes of action. Dr. Vong asserted Plaintiffs could not show a breach of duty, or that any negligence by her caused the baby's death. She produced evidence to show her decision to treat suspected chorioamnionitis with antibiotics in hopes of allowing the mother to progress to a vaginal delivery was consistent with the standard of care when faced with a Category II strip. She also produced evidence to demonstrate the outcome would have been the same even if the fetus had been delivered earlier because the fetus would have succumbed to the advanced in utero E. coli infection. Finally, Dr. Vong maintained that, because her conduct was appropriate and within the standard of care, there was no evidence of extreme and outrageous conduct to support Chimal's claim of IIED.

In support of her motion, Dr. Vong submitted her declaration and excerpts of her deposition testimony, as well as those of various witnesses; the declarations of Dr. Stephen Hebert and Dr. Philippe Friedlich; and Parkview and CHOC medical records.

---

Dr. Vong or any of the nurses at Parkview intended to cause you emotional distress," he answered "No."

11

1.    *Dr. Vong's Deposition Testimony*

Dr. Vong testified she had access to the fetal heart rate tracings and Chimal's vitals on her phone, and that she also relied on the Parkview nursing staff to monitor the mother and fetus and let her know when there was a problem. Although she could monitor the strip "in real time," she was not always able to see the nurses' comments on the LD flowsheet in real time.

Dr. Vong recalled looking at the 9:50 a.m. segment of the strip on May 19 "shortly" after that tracing, and noted the fetal heart rate was 160 beats per minute, "there [was] a single late deceleration," but not "any repetitive decelerations." She reviewed the 10:07 a.m. segment of the strip around 10:30 a.m., which showed the fetal heart rate was 160 beats per minute, with an acceleration and moderate variability. She explained this indicated the fetus was "doing well" and since there had only been one late deceleration in the prior strip, there was "no pattern for . . . intervention right here at this point."

When Dr. Vong looked at the strip around 10:30 a.m., she noticed the 10:15 a.m. tracing showed "an increase in the baseline fetal heart rate to approximately 170 [beats per minute]," indicating "the onset of fetal tachycardia." Dr. Vong called to the hospital at "approximately" 10:30 a.m. and instructed a nurse (presumably Llorico) to take Chimal's temperature, check the cervical dilation, and call her back with the results. She then had the nurse re-check Chimal's temperature and dilation. At this time, Dr. Vong noted Chimal was having normal contractions.

At 10:57 a.m., Dr. Vong identified a late deceleration on the strip. She explained she did not go to the hospital at this point because the fever and fetal tachycardia were "consistent with chorioamnionitis"—indicating the presence of infection—and she wanted to treat it with antibiotics, Tylenol,

12

and IV fluids first "to see if these interventions would help to resolve the fetal tachycardia."

By 11:05 a.m., the strip showed moderate variability and two late decelerations. Dr. Vong did not deliver by cesarean section at this point because it "can take up to an hour" for the Tylenol and antibiotics to take effect, and she wanted to see if there was any improvement so Chimal could continue to progress with her labor. Dr. Vong also explained it was a Category II strip with moderate variability, and "fetal heart rate monitoring guidelines" provide "you can continue to monitor. If there is progression or worsening of the strip to Category [III], then you will need to proceed with delivery." Chimal did not have a Category III strip.

At 12:05 p.m., when the strip showed "persistent" fetal tachycardia and "recurrent late decelerations," Dr. Vong called for an emergency cesarean section. She left Riverside Community Hospital where she was caring for other patients and was at Chimal's bedside by 12:15 p.m. While Chimal "was going to the OR and being prepared for the C-section," Dr. Vong wrote a report at 12:28 p.m. before performing the surgery because, she explained, "[i]t's customary to document that you've discussed the risks and the benefits and consented the patient."

2. *Dr. Hebert's Declaration*

Dr. Hebert, who is board certified in obstetrics and gynecology, opined that Dr. Vong acted within the appropriate standard of care and "none of her treatment or conduct caused Plaintiffs' alleged injuries." He based his opinion on his review of the medical records and deposition testimony of various witnesses, including Dr. Vong.

Dr. Hebert believed Dr. Vong was "actively involved" in Chimal's care and appropriately monitoring the fetal heart strip by remote application. He

13

stated that when Dr. Vong recognized "the patient's signs and symptoms were consistent with chorioamnionitis," her decision to first treat the infection with Tylenol and antibiotics and allow labor to progress in hopes of a vaginal delivery was consistent with the American College of Obstetrics and Gynecology guidelines.

Dr. Hebert explained "[t]he standard of care did not require emergent intervention or delivery by immediate cesarean" between 9:00 a.m. to 10:30 a.m., because, although there was "moderate variability with increasingly frequent decelerations," it was still a Category II strip. Once the strip "began to show late and prolonged decelerations despite appropriate treatment of the fever and presumed chorioamnionitis" between 11:30 a.m. and 12:00 p.m., it was his opinion that ordering intervention was "a matter of clinical judgment." By 11:50 a.m. to 12:00 p.m., when the strip was showing recurrent late decelerations, Dr. Vong appropriately ordered intervention by cesarean. Dr. Hebert opined that, by making this decision "approximately one hour after institution of treatment for chorioamnionitis," Dr. Vong "was in full compliance with the standard of care." And that "[a]ccomplishing the delivery prior to 1:00 pm in this non-elective but not emergent situation was also well within the standard of care for this Category II strip."

Dr. Hebert opined "to a reasonable degree of medical probability, that this baby's outcome would have been the same even if Dr. Vong had decided to deliver well before any indications of significant concern from the fetal heart strip." After stating this opinion, Dr. Hebert explained: "Sepsis[14]

_____

14    Sepsis is "a potentially life-threatening, systemic response of the immune system[.]" (Merriam-Webster's Medical Dict. Online (2023) <https://unabridged.merriam-webster.com/medical/sepsis> [as of Feb. 27, 2023], archived at <https://perma.cc/9CAL-9P2Q>.)

14

occurs when there is infection in the blood that causes a combination of effects including bacterial proliferation in the organs. The infection overwhelms the body's responses, and it becomes a race between doctors providing antibiotics to fight the infection and correcting metabolic abnormalities versus the infection overtaking the organ function. [¶] . . . Obstetricians see chorioamnionitis commonly. It is well known that a certain percentage of babies inevitably succumb to this condition, and it is without any negligence on behalf of the obstetrician. We do know that each newborn is not equally equipped to fight off infection and we know that each mother's bacterial flora are unique, but it would be speculative for any expert to claim they know why this particular baby failed to survive when a majority of babies in the same circumstance would have survived. This is not something the obstetrician can foresee."

### 3. *Dr. Friedlich's Declaration*

Dr. Friedlich is double board certified in neonatology and pediatrics. Based on the same medical records and deposition testimonies, Dr. Friedlich opined "with a very high degree of medical probability" that the baby's "outcome would have been the same even if the infant was delivered up to 12 hours earlier."

Dr. Friedlich explained the laboratory results showed the fetus "grew" E. coli bacteria in its blood, and that "the medical evidence is clear this baby was infected at a very advanced staged [*sic*]." He stated "[t]he baby developed sepsis because of the level of E Coli [*sic*] infection found throughout the infant's body," and explained that "[t]he pathophysiology of bacteria entering the fetus and actually causing sepsis takes time." He observed the placental pathology report showed there was "(1) acute funisitis, (2) acute chorioamnionitis, and (3) acute deciduitis, meaning all layers of the placenta

15

were involved." Highlighting that "there was meconium noted within macrophages (white blood cells that engulf and digest microbes and foreign substances)," Dr. Friedlich explained it is "a well-known medical fact" that "[i]t takes approximately 12 hours for macrophage cells to digest and incorporate meconium material." He further opined that, "in hindsight, the mother was infected with chorioamnionitis" and "[t]he fetal tachycardia was indicative of the fetus being infected in utero and [having gone] into sepsis in utero due to the infection."

Dr. Friedlich noted "the cord gasses obtained by Dr. Vong were not consistent with hypoxic ischemic encephalopathy" because the "[v]enous cord gasses were 7.17 and arterial cord gasses were 7.07," and "to cause brain damage," the cord gasses typically "have to be less than 7." It was his opinion the " 'moderate acidosis' observed was due to the infant's infection," and "not hypoxia." He further explained the reason the fetus was still alive in utero was because "[the] placenta was working hard to oxygenate" the fetus and "[w]hen you have sepsis, vessels dilate, and the heart has to pump a lot faster to accomplish tissue perfusion." Although the "infection created a congenital pneumonia in the baby[, s]ince the baby does not use her lungs in utero, the baby is not technically affected by the pneumonia as long as she has placental support." However, "[a]s soon as you detach the baby from the placenta, the lungs (which were very sick with infection) will not be able to function" and "the baby becomes very sick and goes into septic shock." According to Dr. Friedlich, "congenital infection affects 3 out of every 1,000 babies," and "there is no way for doctors to assess the baby's lungs in utero" and "there was no way Dr. Vong could have known this result would occur."

16

B.    *Plaintiffs' Opposition and Opposition Evidence*

In opposition to the motion, Plaintiffs submitted an expert declaration from Dr. James J. Ingaglio and excerpts of Llorico's deposition testimony, among other evidence.

1.    *Llorico's Deposition Testimony*

Llorico confirmed she made a 10:00 a.m. entry on May 19 in the LD flowsheet, reporting a fetal heart rate of 160 beats per minute coupled with a late deceleration.  She testified "[l]ate decelerations are not normal."  The late deceleration did give her cause for concern regarding the condition of the fetus, and so she performed fetal interventions, including administering IV fluids to Chimal.  By 10:30 a.m., the late deceleration had resolved but Llorico noted fetal tachycardia of 175 to 180 heartbeats per minute.  The fetal tachycardia concerned her and was the reason she called Dr. Vong at 10:37 a.m.

2.    *Dr. Ingaglio's Declaration*

Dr. Ingaglio is board certified in obstetrics and gynecology, and stated he was familiar with the standard of care in that practice and could "competently testify to the standard of care and the cause of death of [the] baby."  Like Dr. Hebert and Dr. Friedlich, he based his opinions on his review of Parkview's medical records, including the strip, the LD flowsheet, Dr. Carsten's medical records and reports by a primary care physician; CHOC's medical records and autopsy report; and Dr. Vong's deposition testimony.

Dr. Ingaglio began by summarizing the medical facts on which he relied for his opinion.  Specifically, he noted Chimal "[d]uring her course of labor, . . . develop[ed] maternal fever (102.5) and maternal tachycardia consistent with chorioamnionitis."  "Fetal heart tones were noted for fetal tachycardia with a baseline between 175 and 180 [beats per minute].  There

17

was moderate variability but there were repetitive late decelerations despite resuscitative efforts." He observed "[t]hick meconium was noted at C-section" and the baby was taken to the NICU for respiratory distress shortly upon birth.

Dr. Ingaglio also highlighted what he considered to be the "[c]ritical timelines" on May 19 (boldface and underline omitted), including that: Category II tracing began at 5:00 a.m. and continued to 10:00 a.m. with late decelerations; Chimal was given ampicillin at 5:30 a.m.; fetal tachycardia began at 10:30 a.m., with late decelerations recorded at 11:00 a.m.; Dr. Vong was made aware at 11:05 a.m. that Chimal had a fever of 102.5 degrees with no cervical change and there was fetal tachycardia with late decelerations; those conditions continued up until 12:00 p.m. when Dr. Vong ordered the cesarean section; Dr. Vong arrived into the operating room at 12:42 p.m. and surgery began at 12:56 p.m.; and finally, thick meconium was present at delivery at 1:03 p.m.

Under the heading "Breach of Standard of Care" (boldface and some capitalization omitted), Dr. Ingaglio rendered the following opinion: "Throughout the labor induction, there were several instances of late decelerations and fetal tachycardia. The nurse contacted Dr. Vong [at] 10:37 a.m on 5/19/2018 and advised Dr. Vong that there were late decelerations present. From 0700 to 1050, there was no cervical change (5/90/-1 for almost 4 hours/failure to progress). At 1100, this patient had fetal tachycardia (HR-170's) and maternal temperature of 102.5. Dr. Vong ordering additional medications only delayed delivery especially in the presence of late fetal heart rate decelerations. For an expert to claim that the outcome would have been the same even if Dr. Vong had decided to deliver this baby sooner does not make sense. The longer the baby remained

18

undelivered the more damage was done as a result of the APGAR of 1 at 1 minute and 1 at 5 minutes and cord gases of 7.07 arterial and 7.17 venous. [¶] From 1100 to 1256/start of surgery, there was a 2-hour delay. If this C-section was called at 1100 [at] the latest and surgery started at 1130 or sooner, more likely than not this baby would be alive and well. This 2-hour delay[15] was catastrophic and resulted in [the baby's] demise from meconium aspiration and respiratory distress."

C.    *Dr. Vong's Evidentiary Objections*

Dr. Vong filed written evidentiary objections to the following four statements in Dr. Ingaglio's declaration on various grounds, including that the challenged statement was vague and ambiguous, lacked foundation, lacked a basis for expert opinion, assumed facts not in evidence, and was speculative, unintelligible and not relevant:  (1) " 'The nurse contacted Dr. Vong at 10:37 on 5/19/2018 and advised Dr. Vong that there were late decelerations present.' "  (2) " 'Dr. Vong ordering additional medications only delayed delivery especially in the presence of late fetal heart rate decelerations.' "  (3) " 'The longer the baby remained undelivered, the more damage was done as a result of APGAR of 1 at 1 minute, 1 at 5 minutes, and cord gases of 7.07 arterial and 7.17 venous.' "  And (4) " 'From 1100 to 1256/start of surgery, there was a 2-hour delay.  If this C-section was called

---

15    We recognize the delay between when Dr. Ingaglio believed Dr. Vong should have called for surgery and when the cesarean actually began would be less than two hours had the surgery not started until 11:30 a.m.  But given that Dr. Ingaglio emphasized that (1) a nurse made Dr. Vong aware of the late decelerations at 10:37 a.m. (which *was* two hours before the 12:56 p.m. start time), and (2) Dr. Ingaglio opined the outcome would have been different had the surgery started at 11:00 a.m. at "*the latest*" (italics added), we do not view the potential discrepancy of up to half an hour as consequential to his opinion.

19

at 1100 the latest and surgery started at 1130 or sooner, more likely than not this baby would be alive and well.' "

The trial court did not rule on any of Dr. Vong's objections.

We note here that Dr. Vong did not object to Dr. Ingaglio's expert qualifications.  Nor did she object to his conclusion that the "2-hour delay was catastrophic" and resulted in the baby's "demise from meconium aspiration and respiratory distress."

D.    *Trial Court's Ruling on Summary Judgment*

The trial court granted Dr. Vong's summary judgment motion, finding she had met her initial burden of showing that Plaintiffs could not establish breach of duty or causation.  Turning to Dr. Ingaglio's declaration to determine if Plaintiffs carried their shifted burden of production, the trial court acknowledged it understood it was Dr. Ingaglio's opinion that " 'Dr. Vong ordering additional medications only delayed delivery especially in the presence of the late fetal heart rate decelerations.' "  The court further understood it was Dr. Ingaglio's opinion "the two-hour delay between the time the patient showed fetal tachycardia and maternal temperature of 102.5 around 11:00am to 12:56pm when the C-section, surgery began 'was catastrophic and resulted in [the baby's] demise from meconium aspiration and respiratory distress.' "

But the trial court found "[t]he problem with Dr. Ingaglio's testimony . . . [wa]s that he does not state Dr. Vong's conduct, including ordering medications or performing the C-section breached the applicable standard of care."  The court also found problematic that Dr. Ingaglio did not "state that Dr. Vong's actions or omissions were a substantial factor in causing Plaintiffs' harm within a reasonable medical probability," but instead he "merely state[d] that it would be 'more likely than not' that the baby would have

20

survived had it been delivered earlier." Finally, the court found the opinion lacking because "Dr. Ingaglio fail[ed] to provide a reasoned explanation for his conclusion" and "d[id] not refute or contradict the well-reasoned and detailed explanation by Dr. Friedlich as to why delivery up to 12 hours [earlier] wouldn't have made a difference." Rather, the court noted "Dr. Ingaglio merely state[d] that the expert's conclusion 'does not make sense,' without adequately explaining why."

Because the trial court concluded that Plaintiffs failed to meet their burden of producing evidence to establish a triable issue of fact as to Dr. Vong's negligence, it also found for Dr. Vong on the IIED cause of action because Plaintiffs had not produced evidence to show "any other extreme or outrageous conduct." The court entered judgment in favor of Dr. Vong and dismissed the entire action with prejudice. Plaintiffs timely appealed from the judgment of dismissal.

## DISCUSSION

### I.

### *Standard of Review and General Principles*

We review an order granting summary judgment de novo.[16] (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39 (*Gonzalez*).) " 'In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment.' " (*Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 504–505 (*Shugart*); *Hernandez v. KWPH Enterprises* (2004)

---

16    Dr. Vong asserts "the standard of review applicable to this appeal is that of abuse of discretion." (Capitalization and boldface omitted.) We reject this point without further discussion, as it is unsupported by any citation to legal authority and it is patently wrong.

21

116 Cal.App.4th 170, 175 ["The appellate court 'must assume the role of the trial court and redetermine the merits of the motion' using the same standards required below."].)

A defendant seeking summary judgment bears "the burden of persuasion" that one or more elements of the cause of action in question cannot be established or that there is a complete defense to it. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) The defendant also "bears an initial burden of production to make a prima facie showing" that no triable issue of material fact exists; if he carries his burden of production, "he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*; Code Civ. Proc.,[17] § 437c, subds. (o), (p)(2).)

In determining whether there is a triable issue of material fact, we consider all the evidence presented on the motion for summary judgment except that to which objections were sustained. (*Gonzalez, supra*, 12 Cal.5th at p. 39; *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181 (*Howmedica*).) " 'We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Gonzalez*, at p. 39.) " 'We accept as undisputed facts only those portions of the moving party's evidence that are *not contradicted* by the opposing party's evidence. . . . In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom *must* be accepted as true.' " (*Hanson v.*

---

[17] All further undesignated statutory references are to the Code of Civil Procedure.

*Grode* (1999) 76 Cal.App.4th 601, 604 (*Hanson*), italics added; *see also Birschtein, supra,* 92 Cal.App.4th at p. 999 [on de novo review of an award of summary judgment, "our account of the facts is presented in the light most favorable to the nonmoving party below, in this case plaintiff, and assumes that, for purposes of our analysis, her version of all disputed facts is the correct one"].)

II.

*The Trial Court Erred in Granting Summary Judgment*
*on the Professional Negligence and Wrongful Death Causes of Action*

On appeal, Plaintiffs do not dispute Dr. Vong carried her initial burden of production to establish that no triable issues of material fact exist as to breach of duty and causation on the negligence cause of action.[18] Plaintiffs contend, however, that they satisfied their shifted burden of production because Dr. Ingaglio's declaration sufficiently presented conflicting evidence on both elements to preclude summary judgment. As we shall explain, we agree with Plaintiffs.

We conclude, as the trial court did, that with Dr. Hebert's and Dr. Friedlich's declarations, Dr. Vong met her initial burden of production to establish she did not fall below the standard of care and that she did not negligently cause the baby's death. Dr. Hebert opined the standard of care did not require Dr. Vong to order delivery by immediate cesarean before the

---

18    " 'The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' " (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1077.)

May 19 12:00 p.m. timeframe because the fetal heart rate tracing was still a Category II strip, and it was appropriate for Dr. Vong to first treat Chimal's fever and chorioamnionitis with antibiotics to allow her to progress to a vaginal delivery.  Dr. Friedlich opined the baby's "outcome would have been the same" even if Dr. Vong had ordered delivery by cesarean "up to 12 hours earlier," and Dr. Hebert largely agreed.  Although not explicitly stated, both experts appear to suggest the baby would have succumbed to sepsis because of the advanced in utero E. coli infection.  When, as here, a defendant in a medical malpractice case moves for summary judgment and supports her motion with expert declarations that her conduct fell within the community standard of care and did not proximately cause the resulting injury, " '[s]he is entitled to summary judgment *unless the plaintiff comes forward with conflicting expert evidence.*' "  (*Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 985, italics added.)

We turn to Plaintiffs' opposition evidence, specifically Dr. Ingaglio's declaration, to determine whether it sufficiently created a conflict in the evidence as to breach of duty or causation.  In doing so, we are mindful that "when considering the declarations of the parties' experts, we liberally construe the declarations for the plaintiff's experts and resolve any doubts as to the propriety of granting the motion in favor of the plaintiff."  (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 125–126; see *Hanson, supra,* 76 Cal.App.4th at p. 604 [" 'the moving party's affidavits are strictly construed while those of the opposing party are liberally construed' "].)  "In light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed *in opposition* to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial." (*Howmedica, supra,* 214

24

Cal.App.4th at p. 189, italics added.) And where there is a conflict in the evidence, " 'the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom *must* be accepted as true.' " (*Hanson*, at p. 604, italics added; accord *Birschtein*, *supra*, 92 Cal.App.4th at p. 999.)

Here, it is also instructive to look at application of the rule of liberal construction to expert declarations filed *in opposition* to a summary judgment motion in other medical malpractice actions. We begin with *Hanson*, *supra*, 76 Cal.App.4th 601.

In *Hanson*, two surgeons who were sued for professional negligence moved for summary judgment on the elements of breach of duty and causation. (*Hanson*, *supra*, 76 Cal.App.4th at pp. 604–605.) Plaintiff was diagnosed with spinal stenosis and, after he underwent surgery to relieve the compression of his spinal canal, plaintiff experienced swelling and pain in his neck, an accumulation of blood in the area, and significant curvature of the upper spine. (*Ibid.*) Experts, in support of the surgeons' motion, opined the surgery was appropriate for plaintiff's condition and performed within the applicable standard of care, and that plaintiff's postoperative complications are known complications with the surgery and not the result of any negligence by the surgeons. (*Id.* at p. 605.)

In opposition, plaintiff's "equally qualified" expert opined that the surgeons acted below the standard of care because they " 'should have' " further investigated the cause of the bleeding at the time of the surgery; discovered plaintiff's internal bleeding and other medical conditions before his discharge from the hospital; explored and sutured plaintiff's dura leak instead of just packing it with absorbent material; and immediately returned plaintiff to surgery when he awoke with symptoms of a nerve injury.

(*Hanson*, *supra*, 76 Cal.App.4th at p. 605.) The expert also opined " 'it was apparent that the surgical procedure that was performed . . . had not only failed to improve the severe congenital spinal stenosis, but indeed [it] had become worse.' " (*Id.* at pp. 605–606.) On causation, the expert opined plaintiff's nerves were injured during the surgery and the care provided by the surgeons " 'contributed to and was a substantial factor or cause in bringing about [plaintiff's] current injuries.' " (*Id.* at p. 606.)

The trial court granted the surgeons summary judgment because it found the declaration of plaintiff's expert "lacked a factual basis." (*Hanson*, *supra*, 76 Cal.App.4th at p. 606.) On appeal, the surgeons argued plaintiff's expert had not shown breach of duty or causation because his declaration focused largely on what the surgeons " 'should' " have done when faced with the complications the plaintiff suffered. (*Id.* at p. 607.) The Court of Appeal reversed. Noting that " 'professional prudence is defined by actual or accepted practice within a profession, rather than theories about what "should" have been done,' " the court found "nothing theoretical about the [plaintiff's expert] declaration." (*Ibid.*) Rather, it clearly asserted specific "factual breaches" in explaining what the surgeons failed to do. (*Ibid.*) The court also found the expert had adequately stated plaintiff suffered nerve damage during surgery and the surgeons' care caused his injuries. (*Ibid.*) Although it found "the style" of plaintiff's expert declaration was "at times a bit obtuse," the court concluded plaintiff was "entitled to all favorable inferences that may reasonably be derived from th[e] declaration," which "inferences include a reading of the declaration to state that the nerve damage [plaintiff] suffered during surgery was caused by the conduct of defendants, which conduct fell below the applicable standard of care. Nothing more was needed." (*Id.* at pp. 607–608.)

In *Shugart*, a case involving postoperative complications following a vaginal repair surgery employing surgical mesh, a gynecologist similarly moved for summary judgment on the elements of breach of duty and causation on a professional negligence claim. (*Shugart*, *supra*, 199 Cal.App.4th at pp. 501–504.) The trial court granted summary judgment, concluding the plaintiff's expert declaration was "deficient" and lacked evidentiary value because it "failed to refer to the materials" on which the expert relied. (*Id.* at pp. 503–504, 505.) The Court of Appeal reversed, concluding the foundational facts and medical records on which the plaintiff's expert relied were before the trial court to support the expert's opinion. (*Id.* at pp. 505–506.) The expert had stated he reviewed the medical records and "explained his opinions in part by references to notations in the medical records of [defendant] that were before the court in support of the moving papers." (*Ibid.*)

Relevant too, the *Shugart* court concluded that although the expert's declaration was "not a model of specificity," it was sufficient to raise a triable issue of fact as to whether the gynecologist's treatment of plaintiff met the standard of care and whether that care caused or contributed to plaintiff's alleged injuries. (*Shugart*, *supra*, 199 Cal.App.4th at p. 506.) The plaintiff's medical expert had opined that the gynecologist: (1) cut the patient's vaginal wall and allowed bacteria to enter the tissues, thereby weaking the healing incision and eroding the supporting mesh, and (2) allowed exposed vaginal mesh to remain vulnerable to bacteria for four weeks without excising it, thereby further interfering with the healing process. (*Ibid.*) "Indulging all reasonable inferences in support of [the plaintiff expert's] testimony," the court found "his declaration adequately raise[d] a triable issue as to whether or not [plaintiff] was unnecessarily exposed to the postoperative infection she

27

suffered; whether the infection was aggravated by [the gynecologist's] care, including the failure to timely excise the protruding mesh; and whether the recuperation time was unnecessarily prolonged, adversely affecting [plaintiff's] overall healing and ability to timely and adequately respond to the later-performed corrective procedures. That was enough to defeat [the summary judgment] motion." (*Ibid.*)

In this case, Dr. Ingaglio, like Dr. Hebert, is board certified in obstetrics and gynecology. Dr. Ingaglio relied on the same medical records and materials relied on by Dr. Vong's experts to provide the bases of his opinions. And like plaintiff's expert in *Shugart*, he "explained his opinions in part by [specific] references to notations in the medical records" that were before the trial court on the motion. (*Shugart, supra*, 199 Cal.App.4th at pp. 505–506.) He discerned these critical facts from the medical records: "Throughout the labor induction, there were several instances of late decelerations and fetal tachycardia." From 7:00 a.m. to 10:50 a.m., "there was no cervical change," that is Chimal remained "5/90/1-1" (or as Dr. Vong spelled out in her operational report, "5 cm, 90 percent effaced and -1 station") "for almost 4 hours" with "failure to progress." At 11:00 a.m., "this patient had fetal tachycardia (HR-170's [or heart rate in 170s]) and maternal temperature of 102.5." These medical facts are *not* disputed.

However, Dr. Ingaglio's *interpretation* of the undisputed medical facts differed from that of Dr. Vong's experts. Contrary to Dr. Friedlich and Dr. Hebert, Dr. Ingaglio opined that given this set of facts, which he explained Dr. Vong was made aware of by the nursing staff, "Dr. Vong ordering additional medications only delayed delivery especially in the presence of late fetal heart rate decelerations" and that the approximately "2-hour delay [in delivery] was catastrophic and resulted in [the baby's] demise

28

[or death] from meconium aspiration and respiratory distress."  He further opined that had Dr. Vong ordered intervention by cesarean at 11:00 a.m. at "the latest and surgery started at 11[:30 a.m.] or sooner, more likely than not this baby would be alive and well."

Dr. Ingaglio's declaration is entitled to all favorable inferences that may reasonably be derived from it.  Indulging all favorable inferences, it is reasonably clear to us that it was Dr. Ingaglio's opinion the standard of care required delivery by immediate cesarean once Dr. Vong became aware the mother and fetus were simultaneously experiencing fetal tachycardia, recurring late decelerations, and an elevated maternal fever that had not improved with antibiotics.  And that because Dr. Vong did not order the cesarean at 11:00 a.m., and did not complete the surgery until two hours later, she breached the standard of care.  Dr. Ingaglio's opinion conflicts with Dr. Hebert's opinion that the standard of care allowed Dr. Vong to continue attempting to treat the presumed chorioamnionitis with antibiotics in utero after 11:00 a.m.  Nothing more is needed.  Dr. Ingaglio's medical opinion is sufficient to raise conflicting evidence on breach of duty.

We disagree with the trial court's view that Dr. Ingaglio's declaration was somehow fatally flawed because it "does not [explicitly] state Dr. Vong's conduct including ordering medications or performing the C-section breached the applicable standard of care."  Under a liberal construction, with all favorable inferences drawn, we believe Dr. Ingaglio's declaration did just that.  He asserted specific "factual breaches" in explaining what he believed Dr. Vong failed to do.  (*Hanson, supra,* 76 Cal.App.4th at p. 607.)  Moreover, after setting out his credentials and expertise in obstetrics and gynecology—which went unchallenged by Dr. Vong—Dr. Ingaglio averred he was "readily familiar with the standard of care for the providers" in that

29

specialty.  He averred he could "competently testify to the standard of care and the cause of death."  He then directed his opinions on Dr. Vong's conduct under the heading, "Breach of Standard of Care."  (Boldface and underline omitted.)  Although the style of his declaration and his opinions might not be the model of specificity, this was adequate.

Likewise, Dr. Ingaglio's declaration was adequate to raise a conflict in the evidence on causation.  Responding to Dr. Hebert's and Dr. Friedlich's opinions, he asserted that "[f]or an expert to claim that the outcome would have been the same even if Dr. Vong had decided to deliver this baby sooner does not make sense."  He explained that "[t]he longer the baby remained undelivered the more damage was done as a result of the APGAR of 1 at 1 minute and 1 at 5 minutes and cord gases of 7.07 arterial and 7.17 venous."  It was his medical opinion that had Dr. Vong called for the cesarean at 11:00 a.m. and performed the surgery by 11:30 a.m., "more likely than not this baby would be alive and well."  He thus concluded the approximately two-hour delay in delivering Chimal's baby was "catastrophic" and "resulted in [the baby's] demise from meconium aspiration and respiratory distress."

To demonstrate the defendant's actions were the proximate cause of the harm in a wrongful death arising from medical negligence, the plaintiff must prove by a reasonable medical probability based on competent expert testimony that a "defendant's conduct *more likely than not* was a substantial factor (a cause in fact) of the plaintiff's alleged injury."  (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 746, italics added.)  In other words, "the evidence must be sufficient to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained *a better result*."  (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 216 (*Alef*), italics added [reversing

30

entry of nonsuit for jury determination of whether failure to monitor heart rate and detect repeated decelerations indicating fetal distress caused brain damage].) The trial court found fault with Dr. Ingaglio's declaration because "[h]e merely state[d] that it would be 'more likely than not' that the baby would have survived had it been delivered earlier," instead of stating explicitly that "Dr. Vong's actions or omissions were a substantial factor in causing Plaintiff's harm within a reasonable medical probability." However, these two standards are the same: "to 'a reasonable medical probability' . . . means more likely than not." (*Kline v. Zimmer* (2022) 79 Cal.App.5th 123, 131.)

Dr. Ingaglio opined it was more likely than not the baby would be "alive and well" if Dr. Vong had not delayed delivery by cesarean by two hours. He explained the fetal tachycardia, maternal fever, and late decelerations were indicators that the fetus was suffering harm, and thus, "[t]he longer the baby remained undelivered the more damage was done[.]" Although he cites post-birth APGAR scores ("1 at 1 minute and 1 at 5 minutes") and cord gas readings ("7.07 arterial and 7.17 venous") as evidence of the damage (which Dr. Vong would not have had access to during labor), these numbers tend to support Dr. Ingaglio's point that the fetus's health continued to deteriorate the longer it remained undelivered.[19] Low APGAR scores indicate poor

_____

[19]  We also note that Dr. Hebert's declaration lends support to Dr. Ingaglio's opinion that time was of the essence. Dr. Hebert opined that when an "infection overwhelms the body's responses, . . . it becomes *a race* between doctors providing antibiotics to fight the infection and correcting metabolic abnormalities versus the infection overtaking the organ function." Moreover, he stated that although "a certain percentage of babies inevitably succumb to this condition [chorioamnionitis], . . . it would be speculative for any expert to claim they know why this particular baby failed to survive *when a majority of babies in the same circumstance would have survived*." It is a reasonable

neonatal health and, as Dr. Friedlich explained, once cord gas levels drop below seven, the fetus may suffer brain damage.  Dr. Ingaglio then concluded the approximately two-hour delay was the critical window during which Dr. Vong's failure to deliver caused the baby's death from meconium aspiration and respiratory distress.  It is in this context that he said:  "For an expert to claim that the outcome would have been the same even if Dr. Vong had decided to deliver this baby sooner does not make sense."  His opinion on causation was sufficient to satisfy Plaintiffs' burden of production to preclude summary judgment on Plaintiffs' first cause of action for negligence.

Dr. Vong's arguments on appeal do not persuade us differently.  She asserts Dr. Ingaglio's opinion—specifically, that " 'Dr. Vong ordering additional medications only delayed delivery especially in the presence of late fetal heart rate decelerations' "—is "too vague, confusing, and unintelligible to constitute a reliable standard of care opinion," and he "provided no foundation or 'reasoned explanation' for his opinion."  For those reasons, Dr. Vong contends his statement "should be excluded" on appeal *by this court*.  She further asserts "Dr. Ingaglio's causation hypothetical is inadmissible and was properly excluded" *by the trial court*.

As we have noted, the trial court did *not* rule on Dr. Vong's evidentiary objections to portions of Dr. Ingaglio's declaration, including the statements she now asserts this court should exclude.  Before ruling on a summary judgment motion, "[t]he trial court must rule expressly" on any evidentiary objections raised by the parties.  (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 531–532 (*Reid*).)  If the court does not expressly admit or exclude the

inference from Dr. Ingaglio's declaration that he believes an earlier delivery of the baby may have obtained "*a better result.*"  (*Alef, supra*, 5 Cal.App.4th at p. 216, italics added.)

32

challenged evidence, "it is presumed that the objections have been overruled, the trial court considered the evidence in ruling on the merits of the summary judgment motion, and the objections are preserved on appeal." (*Id.* at p. 534.) But the burden is on the objector to renew the objections in the appellate court. (*Ibid.*) Otherwise, on our de novo determination, we " 'take the facts from the record that was before the trial court when it ruled on [the summary judgment] motion.' " (*Gonzalez, supra,* 12 Cal.5th at p. 39.)

Although Dr. Vong states "the trial court correctly excluded Dr. Ingaglio's conclusory and speculative opinions," the record does not reveal that the trial court expressly ruled on her evidentiary objections. So we infer she means the trial court *effectively* excluded Dr. Ingaglio's opinions by discounting their value in granting summary judgment. But absent an express ruling, the objections are impliedly overruled. (*Reid, supra,* 50 Cal.4th at p. 534.)

And while Dr. Vong states at the conclusion of her argument on the merits that Dr. Ingaglio's opinions "should likewise not be considered on appeal," this is not sufficient to renew her evidentiary objections before this court. (See *Flake v. Neumiller & Beardslee* (2017) 9 Cal.App.5th 223, 229, fn. 4 [declining to consider objections that were "not separately headed or briefed on appeal"].) To borrow from *Sherman v. Hennessy Industries, Inc.* (2015) 237 Cal.App.4th 1133: "Here, our review encompasses all the evidence submitted by the parties, even though they raised numerous written evidentiary objections to the showing proffered by their adversary. Because the trial court did not expressly rule on the objections, we presume them to have been overruled. (*Reid*[, *supra,* 50 Cal.4th at p. 534].) As no objection has been reasserted on appeal, all have been forfeited." (*Sherman*, at p. 1139, fn. 1.) Having failed to properly renew her evidentiary objections on appeal,

Dr. Vong has forfeited them and we have no occasion to revisit them and grant her request to exclude Dr. Ingaglio's opinion on appeal.[20]

Our task is only to determine whether Plaintiffs have satisfied their burden to produce *contradictory* evidence on the elements of breach of duty and causation, not to weigh the persuasive value or the merits of Dr. Ingaglio's medical conclusions. (*See Aguilar, supra,* 25 Cal.4th at p. 850 [the party opposing summary judgment has only a burden of production, not a burden of persuasion].) The trial court improperly weighed the persuasiveness of plaintiff's expert against defendant's experts. In finding Dr. Ingaglio's declaration insufficient, the trial court criticized Dr. Ingaglio for failing to "refute or contradict *the well-reasoned and detailed explanation by Dr. Friedlich* as to why delivery up to 12 hours wouldn't have made a difference." Plaintiffs have only a burden of production to make a prima facie showing of the existence of a triable issue of material fact. (*Ibid.*) As our high court explained in *Aguilar*, "[a] burden of production entails only the presentation of 'evidence,' " not "the 'establish[ment]' through such evidence of a requisite degree of belief.' " (*Ibid.*) And a "prima face showing is one that is sufficient to support the position of the party in question. [Citation.] No more is called for." (*Id.* at p. 851.)

Because we conclude triable issues of material fact exist as to Dr. Vong's negligence and causation, we also reverse as to Plaintiffs' wrongful death cause of action. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 390 [To prevail on a wrongful death claim, the plaintiff must prove "(1) a 'wrongful

---

[20] Notwithstanding forfeiture, we would conclude Dr. Ingaglio's declaration is admissible for the same reasons we conclude it was sufficient to satisfy Plaintiffs' shifted burden of production on summary judgment.

act or neglect' on the part of one or more persons that (2) 'cause[s]' (3) the 'death of [another] person.' "].)

We express no opinion on the ultimate merits of Plaintiffs' negligence and wrongful death causes of action, but on the record before us we conclude Plaintiffs satisfied their burden of production to make a prima facie showing of the existence of triable issues of material fact on breach of duty and causation. Summary judgment should not have been granted on the first and second causes of action.

## III.

### *The Trial Court Properly Granted Summary Judgment*
### *as to Chimal's IIED Cause of Action*

Chimal asserts the trial court erred in granting summary judgment on her IIED cause of action based on the lack of evidence that Dr. Vong engaged in "extreme or outrageous conduct." We are sure Chimal (and Watson) suffered untold distress from the tragic loss of their baby. However, as we shall explain, that fact alone is insufficient as a matter of law to support an IIED cause of action. We thus conclude the trial court did not err on entering judgment in favor of Dr. Vong on the IIED cause of action.

"A cause of action for intentional infliction of emotional distress exists when there is ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050 (*Hughes*).)

"A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized

35

community.' " ' " (*Hughes, supra,* 46 Cal.4th at pp. 1050–1051.) " 'Liability has been found only where the conduct has been so outrageous in character, and *so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable*[.]' " (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496 (*Cochran*), italics added.)

In cases where California courts have found the defendant's actions did rise to the requisite level of extreme and outrageous conduct, there generally was present an extra element of extreme callousness or base motives that made the conduct complained of outrageous. (See, e.g., *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1007–1008 [corporate director and grandmother of the victim "[f]lying into a tirade at a 13-year-old girl who had been drugged and raped and yelling at her that she was stupid and it was her fault"]; *KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1030 [television reporter recording three young children while he informed them that the mother who lived next door murdered her two children—their friends—and then killed herself]; *McDaniel v. Gile* (1991) 230 Cal.App.3d 363, 373, 375 [attorney withholding legal services when the client would not grant him sexual favors].) In *So v. Shin* (2013) 212 Cal.App.4th 652, 656–657, for example, an anesthesiologist administered insufficient anesthesia and the plaintiff woke up and experienced pain during a dilation and curettage procedure following a miscarriage. When the plaintiff asked the doctor why she awoke during the procedure, the doctor became angry and came within inches of her with a container containing blood and possible fragments of the deceased fetus's body parts. (*Id.* at p. 657.) The Court of Appeal concluded that "forcing a patient who had recently miscarried to look at what she believed to be her dismembered fetus was extreme and outrageous." (*Id.* at p. 673.)

Plaintiffs have not produced evidence of that extra element of extreme callousness or base motives in Dr. Vong's conduct.[21]  Relying on the same evidence underlying the negligence cause of action, including Dr. Ingaglio's opinion that the approximately 2-hour delay was "catastrophic" and caused the baby's death, Chimal contends Dr. Vong's conduct was extreme and outrageous for the following reasons:  Dr. Vong "knew (based on her medical training) that when the temperature of the mother was 102.5 that there was an infection setting in and the baby need[ed] to be delivered as soon as possible."  Dr. Vong "continued to push more medication and prolong the problem for the fetus," while she was attending to other patients at other hospitals, even though she "knew what could happen to the mother and the fetus."  Dr. Vong called for the cesarean at 12:00 p.m. but stopped to write up her report, "instead of going straight to [the operating room] for immediate surgery."  As a result of Dr. Vong's alleged conduct, Chimal asserts she "was subjected to emotional trauma after the baby was born because she could not hear the first cry of her baby," who was immediately rushed to the NICU, while Chimal remained in the operating room "running [a] fever and depressed."  Chimal alleged "she suffered serious emotional distress from

21    Plaintiffs contend the trial court erred in finding they did not submit the consultation report of Dr. Johnny Liquete with their opposition papers, and subsequently denying their request that the court review the report after the summary judgment hearing.  The record does reflect this report was, in fact, before the trial court under a different exhibit number than the one listed by Plaintiffs.  We need not address this contention of error because on our de novo determination of the merits, we have read and considered Dr. Liquete's report.  Dr. Liquete conducted a physical examination of the mother approximately two days after her cesarean section and documented that she still had a fever, elevated white blood cell count, and chorioamnionitis.  These facts do not change our conclusion there is no triable issue of material fact as to Plaintiffs' IIED cause of action.

witnessing the death of her baby caused by [Dr.] Vong's negligence." Here, we note the baby passed the next day at CHOC, when Chimal was still hospitalized at Parkview.

While the evidence Chimal presents, fully credited, shows that Dr. Vong may have made decisions below the standard of care, it does not demonstrate that her actions were, as a matter of law, " 'so extreme in degree, as to go beyond all possible bounds of decency,' " or that they were " 'atrocious, and utterly intolerable.' " (*Cochran*, *supra*, 65 Cal.App.4th at p. 496.) Plaintiffs do not offer facts showing that extra element of extreme callousness or base motives necessary to elevate the conduct to the level of outrageousness required to support an IIED cause of action.

Allegations of negligent conduct alone are insufficient to demonstrate intentional infliction of emotional distress, no matter how tragic the circumstances. For example, in *Ochoa v. Superior Court* (1985) 39 Cal.3d 159 (*Ochoa*), a couple's 13-year-old son became extremely ill while in a juvenile detention facility. (*Id.* at p. 163.) Both parents visited him, witnessed him in severe pain, and experienced extreme mental and emotional distress as a result. (*Ibid.*) By the next day, the boy had been diagnosed with bilateral pneumonia, had a temperature of 105 degrees, was hallucinating and vomiting, and had coughed up blood. (*Id.* at pp. 163–164.) The facility's staff denied the increasingly distressed mother's repeated requests to have her son seen by a private doctor, claiming the boy only had the flu. (*Ibid.*) A staff doctor told her he would give her son a penicillin shot, but the record did not indicate whether he ever did. (*Id.* at p. 163, fn. 3.) The mother was forced to leave, and her son subsequently died. (*Id.* at p. 164.)

After the trial court sustained the defendants' demurrers, the boy's parents sought a writ of mandate to compel the court to set aside the order.

(*Ochoa, supra,* 39 Cal.3d at p. 164.)  Although the California Supreme Court found the plaintiffs had pled facts sufficient to support claims for *negligent* infliction of emotional distress and deliberate indifference to serious medical needs in violation of state and federal constitutional protections, it concluded the alleged facts were insufficient to state a cause of action for IIED.  (*Id.* at p. 165, fn. 5.)  The Court reasoned, "although defendants conduct did cause the plaintiffs untold distress, it is evident that the defendants acted negligently rather than with the purpose of causing the plaintiffs emotional distress."  (*Ibid.*)

The same is true here.  Although Dr. Vong may have acted negligently in her care of Chimal, the asserted facts Plaintiffs rely on do not demonstrate an express intent to cause emotional distress to Chimal.  Nor do they support a claim that Dr. Vong acted with reckless disregard of not just the possibility, but the *high probability*, of causing emotional distress.  "A defendant's conduct is in reckless disregard of the probability of causing emotional distress if [he] [she] has knowledge of a high degree of probability that emotional distress will result and acts with deliberate disregard of that probability or with a conscious disregard of the probable results."  (BAJI No. 12.77.)  Being aware that an adverse outcome is medically *possible*, is not the same as knowing that it is highly probable.

Accordingly, we conclude Plaintiffs have not met their burden of producing evidence showing extreme and outrageous conduct by Dr. Vong. We affirm the trial court's order entering judgment in favor of Dr. Vong on Chimal's IIED cause of action.

## DISPOSITION

The judgment is reversed with directions to the trial court to vacate the order granting summary judgment.  The court shall enter a new order

granting summary adjudication of the third cause of action for intentional infliction of emotional distress and otherwise denying the motion for summary judgment or summary adjudication.  Plaintiffs shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)


DO, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.